No. 29,867.

MARY YASBEC et al., *Appellees*, v. THE HARTFORD ACCIDENT AND INDEMNITY COMPANY, *Appellant*, et al.

(297 Pac. 422.)

Opinion filed April 11, 1931.

*C. O. Pingry, P. E. Nulton* and *G. L. Stevenson,* all of Pittsburg, for the appellant.

*Douglas Hudson,* of Fort Scott, *Phil H. Callery* and *James E. Callery,* both of Pittsburg, for the appellees.

The opinion of the court was delivered by

Dawson, J.: This litigation had its inception in proceedings to obtain compensation for the death of a workman who sustained fatal injuries in a Crawford county coal mine nearly six years ago. Eventually it developed into an action of garnishment to collect on an oral contract of industrial accident insurance to satisfy an award of compensation in behalf of the deceased workman's dependents.

In the year 1925 one Enrico Chiocci and two partners operated a coal mine near Mulberry in Crawford county. The business name of the partnership was the Umbria Coal Company. The partners held an annual policy of accident insurance to provide funds to pay compensation for injuries which might happen to any members of their group of workmen. This annual policy of insurance expired on April 20, 1925.

About April 14, 1925, Chiocci, one of the partners, called on W. J. Medland, of Mulberry, a local agent of the Hartford Accident & Indemnity Company, to obtain a similar policy to protect his workmen for another year. Medland told Chiocci that he would try to provide the desired insurance and would let him know in a day or two. On April 17 Chiocci again called on Medland and the latter informed him that his company would accept the risk. On April 20, 1925, Chiocci again went to Medland's office, accompanied by his partners; the application for insurance was signed by them; and Chiocci gave Medland his check for $100 as the advance minimum premium. Medland executed a receipt for this amount, which read:

"Mulberry, Kan., April 20, 1925, received of Umbria Coal Company, $100 deposit on compensation policy. W. J. Medland & Co., by W. J. Medland."

Medland forwarded the application for the desired policy of group insurance together with individual applications for two of the partners.

At the time the application was signed and the advance premium paid, Medland told Chiocci to go ahead and operate the coal mine as the employees of the partnership were covered and that the insurance was with the Hartford company. Chiocci testified:

"Q. State what you said, if anything, to Mr. Medland when you signed this application about what kind of a policy on your men that you wanted.

"A. I told him I want one like we have before. He told me about said same association for the insurance."

The association referred to was a group of accident and indemnity companies which included the defendant company and the Maryland Casualty Company and three or four other companies which were affiliated for the purpose of apportioning the business of furnishing insurance to employers whose workmen were protected by the compensation act.

On April 22 the partners again called on Medland and he told them that they were covered. Still later Chiocci again went to Medland's office to inquire about the policy. He testified:

"A. I went in his office about the 24th or 25th, I don't remember just the date, and I say 'Mr. Medland, you got our policy ready?' 'The policy never come yet,' he say, 'Not yet. You go to work, you covered anyway—not to worry about that, it will be in some of these days.'"

While matters pertaining to the group insurance were in this status, and before either a binder or a policy had been issued, on May 16, 1925, Frank Yasbec, one of the Umbria Coal Company's employees, sustained injuries from which he died five days later, on May 21. On the following day the Hartford company telegraphed its agent at Pittsburg to decline the coal company's application of April 20. He notified Medland, and the latter notified Chiocci and tendered back the $100 advance premium. Chiocci refused to accept it. Group insurance was promptly obtained in another company affiliated with the Hartford, and the tedious task of collecting compensation for the death of the workman began.

On application of Mary Yasbec, widow, and three minor children of the deceased workman, an arbitrator was appointed; a hearing was had, and on June 5, 1926, an award of $3,800 was made in favor of the dependents, plaintiffs herein. An allowance of $150 was also made for hospital attention and medical service. Plaintiffs then filed a motion for a lump-sum judgment for 80 per cent of the award due and prospectively due thereon, and on September 24, 1926, a judgment to that effect for $3,190 was rendered by the district court. This judgment was apportioned by the court between the widow and the three minor children respectively.

On October 17, 1926, summons in garnishment was issued to this appellant, the Hartford Accident & Indemnity Company, based on the theory that it held assets belonging to the coal company which plaintiffs were entitled to reach and subject to the satisfac-

tion of their judgment. The appellant denied possession of assets of this coal company and denied indebtedness to it. Issue was taken on the garnishee's answer, and trial of that issue began in June, 1927, and after some testimony was taken the case was continued.

On April 3, 1928, an execution on the judgment of September 24, 1926, was returned unsatisfied; and on April 4, 1928, an action was begun by Mary Yasbec against the Umbria Coal Company to recover her apportioned share of the judgment, $1,019.12, and this appellant, the Hartford Accident & Indemnity Company, was named as codefendant. The same day another action was brought on behalf of the minor dependents, against the same defendants, to recover their respective shares of the judgment, aggregating $2,020.88. The plaintiffs' theory of bringing in appellant as defendant in these actions was predicated on the arrangement for insurance made between Chiocci, one of the partners of the coal company, and Medland, local agent of the defendant company, on April 20, 1925, and that the latter owed the coal company the requisite amount to satisfy plaintiffs' adjudicated claim for compensation, and that it should account therefor as garnishee.

These two cases were removed to the federal court and consolidated. That court ruled that it had jurisdiction because of diversity of citizenship, and that the two actions were in fact but one, and that the total amount involved was in excess of $3,000; but the federal court tactfully pointed out to the litigants that the controlling issue in the federal litigation was involved in the garnishment proceedings in the state court and induced the litigants to dismiss the federal proceedings without prejudice at plaintiffs' costs and to return to the state court and try the garnishment case to a conclusion.

Thereafter the latter cause came on for hearing in the district court without a jury. Oral and documentary evidence was introduced at length. The trial court determined the material issues in favor of plaintiffs and against the garnishee and defendant, the Hartford Accident & Indemnity Company, and gave judgment accordingly.

Defendant appeals, properly centering its main attack on the judgment on the ground that Medland, its local agent at Mulberry, had no authority to bind the company by an oral contract of insurance if one was made by the negotiations with Chiocci for Umbria Coal Company between April 14 and April 24, 1925, as narrated above.

Before considering this vital point, we may remark that third parties for whose benefit an insurance contract is made can maintain an action to enforce it (*Samson v. United States Fidelity and Guaranty Co.*, 131 Kan. 59, 259 Pac. 427), and that an oral contract of insurance can be made which will bind the parties concerned (*Insurance Co. v. Stone*, 61 Kan. 48, 58 Pac. 986; *Moulton v. Benefit Society*, 64 Kan. 56, 67 Pac. 533; *Boyer v. Hail Insurance Co.*, 86 Kan. 442, 121 Pac. 329; *Wilson v. Insurance Co.*, 90 Kan. 355, 358, 133 Pac. 715).

We think, also, that if Medland had authority, express or implied, to make an oral contract on behalf of the defendant company, he did make it, as shown by the pertinent testimony which was practically uncontroverted. Chiocci asked Medland if he could obtain the insurance. Medland said he thought he could. A day or two later Medland told Chiocci that his principal, the Hartford company, would accept the risk and that a binder would be furnished until the policy could be issued. Chiocci and his partners signed the application and paid Medland the minimum advance premium. Medland assured Chiocci that the coal mine could be operated, as it had the promised insurance protection. Chiocci and his partners did all they were required to do when they signed the application and paid their money. Medland receipted for the money and told them their application was accepted and that they could operate their coal mine, in the confidence that the promised insurance would protect their workmen. When the policy did not arrive when expected and Chiocci repeatedly inquired about it, Medland said, "You go to work, you [are] covered anyway,—[do] not worry about that, it will be in some of these days."

The court holds that under those circumstances a binding oral contract was made if Medland had authority to bind the defendant company, and to that question we now address our attention.

Counsel for defendant contend quite correctly that a mere soliciting insurance agent has no power to obligate his company by a contract of insurance. But it will not do to take it for granted that such was the limited scope of Medland's agency. Let us see what the evidence is touching Medland's authority. He had been some sort of agent of the defendant company for nearly eight years when he conducted the transaction which gave rise to this controversy. His written contract of employment which had been renewed from time to time, in part, reads:

"AGENCY AGREEMENT.

"This agreement, made this 9th day of March, A. D. 1922, between the Hartford Accident and Indemnity Company, of Hartford, Conn. (hereinafter called the company), and W. J. Medland, Mulberry, Kan. (hereinafter called the agent), witnesseth:

"1. The agent is appointed for the purpose of procuring for the company acceptable applications for the classes of insurance and surety bonds hereinafter named, in accordance with the rules and printed, written and telegraphic instructions of the company, and to receive and receipt for the premiums upon such insurance. . . .

"2. The agent's territory is Mulberry, Kan., and vicinity. . . .

"3. The agent shall, subject in all respects to the company's rules and the instructions of the officers of the company, thoroughly and efficiently canvass, or cause to be canvassed, the said territory, and shall perform generally such other duties and services in connection therewith as shall further the interests of the company.

"4. All premiums received by the agent for the company shall be accepted and held by the agent as a fiduciary trust until delivered to the company, it being understood that all premiums paid to the agent are the property of the company, that the commissions payable under paragraph twelve hereof are debts due the agent by the company and the privilege, if granted, of deducting commissions from said premiums shall not be taken as a waiver by the company of its exclusive ownership therein. The agent shall be liable to the company for all original premiums on bonds or undertakings issued by or through his agency, and shall pay same and all collected subsequent premiums at the times and in the manner set out in the 5th paragraph hereof.

.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"6. The agent shall keep true and complete records of. all policies, certificates, binders and other numbered forms issued and of all other business done for the company through him, and shall keep in proper form full and accurate accounts of premiums collected and other financial transactions affecting the company. . . .

"10. In consideration of and as full compensation for all services rendered and disbursements made under this agreement the company will allow, and the agent hereby agrees to accept, commission on all net . . . cash premiums collected and paid to the company by the agent upon the following classes and at the respective rates:

| Class of business. | Rate of compensation. |
|---|---|
| Employers' liability | 12½% |
| Workmen's compensation | 10% |
| Coal mine compensation | 5% |

(Signed)    HARTFORD ACCIDENT AND INDEMNITY COMPANY,
By H. D. LeMESSURIER,
W. J. MEDLAND, Agent.

"Amendment to Agency Agreement Affecting Casualty Commissions Between Mr. W. J. Medland, of Mulberry, Kansas, and Hartford Accident and Indemnity Company.

"On all business, new and renewed, effective on and after February 1, 1923, the rates of commission under said agency agreement in the following lines are changed to read:

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"*b.* On workmen's compensation and employers' liability premiums on underground coal mining risks, 5 per cent.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"(Signed)   Hartford Accident and Indemnity Company,
"By H. D. LeMessurier,
"W. J. Medland.

"Accepted: W. J. Medland."

The provision of the contract relating to authority to deal with the public is contained in paragraph 1, and the agent's territory is designated in paragraph 2. Other paragraphs deal with the relation of the agent to the principal. The grant of authority in paragraph 1 is quite indefinite. It does not provide that applications shall be transmitted to the company, and does not specify to whom applications for insurance and bonds shall be acceptable. It does not forbid the agent to issue policies or bonds, or to issue binders while acceptability of applications is under consideration. Other paragraphs clear up the uncertainty. In paragraph 1 no distinction is made with respect to policies and bonds, and paragraph 4 takes it for granted that the agent may and will issue bonds. Paragraph 6 requires the agent to keep a record of policies issued, certificates issued, binders issued, and other business done, not *by* the company through the agent, but *for* the company through the agent. It is not likely the company required the agent to keep the company's record of what the company itself issued. Binders are referred to in paragraph 6 only. While the reference contemplates binders of a numbered form there is no prohibition against an oral binder as a part of the business done for the company, and the matter of a record was one between the agent and the company. In this instance the oral contract amounted to a binder, making the insurance effective until the policy was issued or the insurance was rejected.

This court has no hesitancy in holding that Medland's powers as agent of defendant thus outlined were broad enough to bind his principal in the transaction which he conducted with the partners of the Umbria Coal Company on April 20, 1925, and that Chiocci and his partners, who knew nothing about any limitations of Medland's

authority, if there were any, had a right to rely on his assurance that their employees were protected and that they could go ahead with the operation of their coal mine. (*Townsend v. Railway Co.*, 88 Kan. 260, 128 Pac. 389, syl. ¶¶ 1, 2.)

The other matters urged upon our attention by counsel for the litigants have been carefully considered, but they suggest nothing to justify further discussion. It is nearly six years since the husband and father of these plaintiffs died of injuries in a coal mine for which compensation ought to be paid, and to provide the wherewithal therefor defendant's authorized agent accepted the advance minimum premium paid by his employers, Chiocci and his partners, and gave them the assurance that they could "go ahead and work," that they were "not to worry" about the fact that the insurance policy had not arrived, that they "were covered anyway." Now that assurance must be redeemed.

The judgment is affirmed.

SLOAN, J., not participating.