Alma M. EPPERSON, Administratrix of the Estate of Arthur R. Epperson, Deceased, Appellant,

v.

CONNECTICUT FIRE INSURANCE COMPANY, a corporation, Appellee.

No. 7137.

United States Court of Appeals Tenth Circuit.

Feb. 25, 1963.

Rehearing Denied April 3, 1963.

Donald R. Newkirk, Wichita, Kan. (Wayne Coulson, Paul R. Kitch, Dale M. Stucky, Robert J. Hill and Gerrit H. Wormhoudt, Wichita, Kan., with him on the brief), for appellant.

Richard C. Hite, Wichita, Kan. (W. A. Kahrs, Robert H. Nelson, H. W. Fanning and Darrell D. Kellogg, Wichita, Kan., with him on the brief), for appellee.

Before BREITENSTEIN, HILL and SETH, Circuit Judges.

SETH, Circuit Judge.

The appellant is the widow of a decedent killed in a collision with the car of a Mr. James Given. She has brought a suit for the wrongful death of her husband which the Connecticut Fire Insurance Company refused to defend on behalf of James Given. The insurance company, appellee here, then brought this declaratory judgment action for an adjudication that it had no insurance in force on the automobile of Given at the time it was involved in the accident. Given filed an answer in the trial court, but did not otherwise participate in the trial and is not a party on this appeal.

The trial court found that appellee's policy of insurance issued to Given had expired the day before the accident, and thus held for appellee. At the trial the issues were reduced to the question whether or not appellee's policy issued

to Given was renewed by a telephone conversation between Given and a general agent of the appellee. The case was heard entirely upon depositions.

The record shows that the Eckberg Agency of Kansas City, Kansas, was a general agency of the Connecticut Fire Insurance Company and had written Given an automobile liability policy for the period April 1957 to April 1958, and another from April 1958 to April 18, 1959. The Givens had done business with this agency for a number of years. When the first policy was issued to Given, he and his mother went to the agency, talked to a Miss Farris, the policy was delivered at that time and arrangements were made for the payment of the premium. Before this policy expired, Mr. Eckberg contacted the mother, and Given and his mother again went to the insurance office and arranged for a policy to cover the period to April 18, 1959. This policy was written and delivered while they were in the office. Given made a down-payment on the premium and arranged for the balance. On this second visit the conversation was again with Miss Farris, and Given told her that in his work it was necessary for him to travel in many states and that he stayed only a short time at each location. This renewal policy showed this occupation, and the address of his mother at Muncie, Kansas, as his home address. Some time later Given called Miss Farris and arranged with her for a non-ownership endorsement to be added to the policy.

In March 1959 Given incurred a tow-in charge while in Iowa and phoned his mother, asking her to tell the agency that he would call them about such a claim. He made the call on March 6, 1959, and talked with Miss Farris about the towing charge. While they were talking, Miss Farris brought up the matter of the renewal of his policy which was to expire on April 18, 1959, and there followed the conversation upon which this suit centers. Both Given and Miss Farris testified they reached an understanding during this conversation that Given wanted the policy renewed. Given testified in his deposition that he asked Miss Farris over the phone to write a new policy and to send him the bill. She indicated that the rates were different in different places and wanted to know where the car would be used. He said she could find out where he was through his mother. He was doing the same work then that he was doing when the prior policy was issued. He testified that a non-ownership endorsement was not discussed, and he told her to write the policy as it was the first time. He also said that he directed Miss Farris to renew the policy and that he gathered from the conversation that she understood his wishes. Miss Farris in her deposition said that she understood that Given wanted the policy renewed, and that it was to be then renewed. As to the place of use of the car she said the premium rate would vary depending on the place of use, but she did not tell Given that she would wait to issue the policy to see if he went to a low premium area. As to this point she said, "Actually I had to have that information before I could type the policy." She recalls a discussion of a non-ownership endorsement. As to these two points, the following question and answer appear in her deposition:

"Q. Well, he was to let you know some additional information you needed in order to renew it as you thought it should be done, but you and he had a complete understanding it was to be renewed then, didn't you? A. Yes."

There was no contact between Given and the agency after this conversation until April 19, 1959, on which day the accident occurred in which appellant's husband was killed. However, during March 1959 Mr. Eckberg of the agency phoned the insured's mother several times in regard to the renewal she told him she would let him know, and also apparently indicated that she and her son would come to the office. They did not do so and no written renewal policy was ever prepared.

Miss Farris was manager of the agency and had full authority to write policies and to otherwise bind the appellee. The parties are in agreement and the authorities in Kansas hold that parol agreements for renewal of contracts of insurance are there valid and enforceable. Yasbec v. Hartford Accident & Indemnity Co., 132 Kan. 827, 297 Pac. 422 and 133 Kan. 175, 299 Pac. 257; Wilson v. German-American Insurance Co., 90 Kan. 355, 133 Pac. 715. The parties likewise agree and again the authorities there hold that such parol contracts may be made by an insuror's agent. Wilson v. German-American Insurance Co., supra. The proof required in Kansas to establish an oral contract for renewal of the policy is different from the proof required to establish an initial oral contract of insurance. "[L]ess strictness of proof may be tolerated" when the alleged agreement is to renew. Mooney v. Merriam, 77 Kan. 305, 94 Pac. 263. Likewise all concerned agree that a parol contract presupposes that the parties have agreed upon its essential elements. Smith v. Hartford Fire Ins. Co., 120 Kan. 53, 242 Pac. 455.

In Mooney v. Merriam, supra, the Kansas court had before it an alleged oral agreement to insure a barn and its contents against fire. There had been a former policy but it had expired more than two years before the conversations upon which the agreement was based. The court held that there was no contract and based its ruling to a large extent on the fact that there was no understanding as to which of the several companies represented by the agency would issue the policy. The holding, as indicated above, was that "less strictness of proof" would be required for a renewal of the policy than for a new policy. The court also stated, "In order that any contract can be made it is necessary that the minds of the parties shall meet upon the main proposition." Also in referring to a Wisconsin case it mentioned that the minds of the parties should meet on all the essential provisions. It held that there had been no such understanding in the case under consideration as to which insurance company would write the policy, and that the agent could not represent a company and the prospective insured at the same time. We feel that the Mooney case turned on the point that there was no meeting of the minds as to which company would write the policy, although other points were mentioned. It was a situation not involving a renewal although reference was made to an old policy.

One of the most significant Kansas cases is Baker v. North River Insurance Company, 112 Kan. 530, 212 Pac. 118, which concerned a renewal of a policy by an unwritten understanding between the insured and an agent. The Kansas court said that it should be presumed that the renewal would be made on the same terms and conditions as the expiring policy, and stated in part: "Even where there is a contract arrangement between the insured and the local agent to renew a policy, the presumption is that the renewal is for the same time, terms, premium, and with the same insurer." This presumption, when applied in the case at bar, will supply the terms which were to be contained in the renewal policy, but it will not provide or assist in the establishment of an agreement to renew in the first instance. The agreement for such a renewal must be established by satisfactory evidence.

Was the new place where Given was going to work, as distinct from the address in Muncie, Kansas, an essential element of the agreement? We think not. In this connection there are two aspects which were considered significant by the agency. The first was the fact that the premium would vary depending on the place where the insured was working, and secondly Miss Farris apparently considered it was needed for the preparation of the policy form. Neither the exact manner of payment nor the dollar amount of the premium was discussed during the telephone conversation in question. Thus it must be considered that Given was prepared to pay

the premium whatever its exact amount might be computed, and that the agency felt that the premium would be paid. Given testified as to this point that he merely asked them to send the bill. There was no other suggestion by Miss Farris during the conversation, and Given's testimony was not contradicted. Thus it does not appear that the amount of the premium as such was considered of sufficient importance by the parties to discuss during the conversation other than it might vary from place to place, and had no bearing on whether or not the policy would be renewed. It was clear that the premium would be fixed by applicable rates. The record shows that the agency after the conversation learned from Given's mother that he had no regular address as he was still moving from place to place. The appellee asserts that the premium is an essential element, and it was not agreed upon because the address of the insured was not furnished to Miss Farris. As we have indicated in this opinion, the exact amount of premium was not considered significant by the parties during the conversation in question. The agency was not sufficiently concerned about the collection of the premium to mention it, and the insured was prepared to pay the amount computed by Miss Farris as the applicable premium. This precise amount would be arrived at by the application of established rates or tables and the parties thereby tacitly agreed upon the method for the determination of this factor.

In 1 Couch, Insurance, 2d Ed., § 14:16, the author discusses this problem and states:

"Equally clear it is, that the failure to agree upon and state the rate of premium to govern an oral contract of fire insurance does not invalidate the contract, where the rates are standard in the community on the specific property covered, since the law will imply the promise to pay the standard rate."

It would seem that the same reasoning would apply to the premium on the type of insurance here under consideration.

Likewise the same author stated in § 14:18:

"A missing term of an oral contract, such as the amount of the premium to be paid or the duration of the risk, may be gathered or implied in a proper case from customs and usages,"

and further in the same section:

"The actual payment of the premium is not a prerequisite to the making of an enforceable oral contract of insurance, as long as there is an understanding by the insured to pay the premium. Accordingly, if the intention of the parties to the contract as to the amount of premium to be paid, or the duration of the policy, can be gathered from the circumstances of the case, an oral contract will be sustained, although no express agreement was made as to the premium or duration of risk."

As to the non-ownership endorsement, this likewise had no bearing on whether or not the policy would issue. Given does not recall that it was even mentioned during the conversation. The parties had understood each other that a renewal was to be made, and in view of the fact that a non-ownership endorsement had been issued separately on a previous occasion, this also did not go to the basic agreement that the expiring policy would be renewed. The evidence shows that a renewal was agreed upon during this conversation, and a contract of renewal resulted, embracing all the terms and conditions of the expiring basic policy.

■ The appellee urges strongly that the mother of Given was his agent in the dealings with the Eckberg Agency. The record does not show this to be the case. She accompanied Given on two visits to the agency when prior policies had been written, but there is no indication that the agency was dealing with her rather than her son, nor would there be any reason why the agency would then consider her to be an agent when her son was present. It is apparent

from the record that both the son and the agency used the mother to get in touch with each other. This was Given's "home" address, and the address used in other policies. On the occasion when the conversation in question occurred, Given had asked his mother to alert the agency that he was going to call them about the towing charge. On the occasion of the conversation itself, Given and the agency were dealing directly with one another. Here again Given advised the agency that he could be reached through his mother or that he would give messages or information to the agency through his mother. Mr. Eckberg later contacted the mother about the writing of the policy in question, but there was nothing in the previous course of dealings that would justify him considering her as the agent of Given. She was no more than a source of information about Given. Thus everything considered she was not an agent by reason of the previous conduct of any of the parties concerned. Her only capacity here was that of a mother.

■ Since this case was tried on depositions only, the parties in their briefs discuss Rule 52(a) of the Rules of Civil Procedure. The position of the appellate court under these circumstances was discussed in Lamb v. I. C. C., 259 F.2d 358 (10th Cir.). It had been held in several previous cases that we are in as good a position to evaluate the stipulated facts, or as here the depositions, as was the trial court and we should do so. However it was pointed out that this should not be done independently of the trial court's findings. Rule 52(a) contemplates that the only factor which may be disregarded under this situation is the opportunity of the trial judge to judge the credibility of the witnesses. The rule contemplates even with this element eliminated that findings not be set aside unless clearly erroneous. The test to be applied by the appellate court is referred to in United States v. U. S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. Although applying these standards to the case at bar, we never-theless hold that those findings of the trial court that there was no agreement reached between Given and the agency must be set aside, and the case is

Reversed.