(657 P.2d 64)

No. 53,858

MICHAEL E. BOONE, *Appellant,* v. ROBERT T. LOWRY and MFA MUTUAL INSURANCE COMPANY, COUNTRYSIDE CASUALTY COMPANY and MFA LIFE INSURANCE COMPANY, d/b/a MFA Insurance Companies, *Defendants,* v. MFA MUTUAL INSURANCE COMPANY, *Appellee.*

Opinion filed January 6, 1983.

*David P. Troup* of Weary, Davis, Henry, Struebing & Troup, of Junction City, for the appellant.

*Howard Harper* of Harper & Hornbaker, Chartered, of Junction City, for the appellee.

Before FOTH, C.J., JEROME HARMAN, Chief Judge Retired, assigned, and FREDERICK WOLESLAGEL, District Judge Retired, Assigned.

HARMAN, C.J. Retired: Michael Boone appeals from a judgment denying garnishment of MFA Mutual Insurance Company. The garnishment was based upon an errors and omissions policy MFA had issued covering its agent, Robert T. Lowry, against whom Boone had obtained a default judgment based upon a fire insurance policy purportedly to be issued by MFA or Kansas Fair Plan upon Boone's house. The big issue is whether violation of a cooperation clause in the agent's errors policy resulted in substantial prejudice to the insurer's ability to defend itself.

Appellant Boone owned a home in Junction City. In late 1978 his homeowner's insurance company informed him his current policy would not be renewed. In December of that year he went to the Junction City office of appellee MFA Mutual Insurance Company seeking replacement coverage for his property. De-

fendant Robert T. Lowry was MFA's agent. Appellant applied for $21,000 insurance, to be procured through Fair Plan (Kansas All-Industry Placement Facility) or MFA, and Lowry assured him there would be no problem. MFA participates in the Fair Plan program and its agents are authorized to handle applications for Fair Plan insurance. Lowry thereafter advised appellant and appellant's house mortgagee that appellant's improvements were insured. Lowry, however, did not obtain an insurance policy on appellant's house and contents, which were destroyed by fire February 14, 1979.

Neither Fair Plan or MFA had received an application from Lowry. After the fire appellant made demand of MFA for $21,000 for the loss. MFA investigated the matter, as a result of which it denied liability.

On September 20, 1979, appellant filed suit against both agent Lowry and MFA for $21,000 on the theory that a contract of insurance arose by reason of Lowry's conduct.

Shortly after summons was served on Lowry, he left Junction City for parts unknown, abandoning his job and family, and despite extensive efforts by MFA to locate and persuade him to return to Junction City, he has not been heard from since, except for a phone call by him from Enumclaw, Washington, in an abortive effort to talk to one of MFA's home office attorneys.

About this time, MFA discovered that Lowry had been a dishonest agent — he had been binding applications for insurance for potential insureds and keeping the premiums and he had embezzled $7,500 in premiums, perhaps more.

MFA's local counsel first entered an appearance on Lowry's behalf in Boone's suit on the fire policy. Later, with permission of the court upon statement of local counsel that the appearance had been made inadvertently, MFA withdrew from that representation of Lowry, without reservation of rights. (Discovery of MFA's records later revealed home office direction that local counsel appear on behalf of Lowry in the action. MFA's home office claims attorney acknowledged that the statement that MFA had never intended to represent Lowry was incorrect.) This withdrawal resulted in appellant taking a default judgment against Lowry for $21,000.

Appellant's claim against MFA on the purported insurance contract proceeded to trial. The jury rendered a verdict against

MFA for $6,536.50. MFA appealed this judgment. Because of valued policy law and an oral instruction diluting its efficacy, this court determined that the verdict was an improper compromise on the issues of liability and damages, and directed reversal and new trial on all issues (*Boone v. Lowry,* No. 52,747, memorandum opinion filed February 25, 1982, *rev. denied* April 14, 1982).

While the appeal just mentioned was pending, appellant commenced this proceeding, one in garnishment to collect from MFA $21,000, the amount of his default judgment against Lowry, by reason of an agent's errors and omissions policy which MFA had issued insuring its erstwhile agent Lowry.

The trial court heard the garnishment action and denied liability, ruling that the errors and omissions policy was applicable but that Lowry had breached the cooperation clause of the errors and omissions policy to MFA's prejudice. The matter is here for review.

The trial court's findings and conclusions are as follows:

"1. On September 19, 1979, plaintiff Michael E. Boone brought suit in this Court in this case against Robert T. Lowry, an insurance agent in Junction City, and MFA Insurance Companies claiming that plaintiff made application to defendant Lowry for fire insurance and was advised by Lowry that there would be no problem. Defendant Lowry advised Boone's mortgagee, Citizens Savings Association, that the improvements were insured. On February 14, 1979, Boone's residence property burned. Boone learned he had no insurance. Following the filing of the law suit mentioned and service of summons upon him on September 20, 1979, Lowry left Junction City, his insurance office, his wife and six children.

"2. MFA attempted to get in touch with Lowry but was unable to do so until after the principal case against MFA was tried to a jury and the jury awarded a verdict in Boone's favor of $6,536.50.

"3. By reason of Lowry's disappearance and failure to be present for the taking of a non-waiver of rights and for trial, MFA decided it should not attempt to defend Lowry based on his violation of the cooperation clause.

"4. On September 29, 1980, a default judgment was taken in favor of Boone and against Lowry in this Court in this case in the amount of $21,000.00.

"5. Defendant Lowry was insured by the garnishee at all times material hereto under a policy of liability insurance entitled 'Insurance Agents and Brokers Errors and Omissions Policy.'

"6. Said policy provided in part that the insurer would pay all sums which the insured shall become legally obligated to pay on account of any claim made against the insured and caused by any negligent act, error or omission of the insured in the conduct of the insured's business as an agent of MFA Mutual Insurance Company or its affiliated or subsidiary insurance companies or of any other insurance company for which the insured shall have acted at the time of the

negligent act, error or omission with the written consent of MFA Mutual Insurance Company.

"7. Plaintiff claims and testified at the jury trial involving the principal case against MFA that he sought insurance in the amount of $21,000.00 from defendant Lowry on or prior to December 17, 1978, and that he applied for insurance both with MFA and to the Kansas All-Industry Placement Facility (FAIR Plan). Although others were made earlier, MFA now solely claims the 'cooperation clause' was materially breached by Lowry and affords a defense on this garnishment.

"8. Prior to suit being filed by plaintiff, garnishee investigated plaintiff's claim and garnishee's representatives discussed the matter with Lowry on several occasions. On no occasion either before or after filing of the lawsuit did Lowry refuse upon request to discuss plaintiff's claim with any representative, employee or attorney for garnishee, but he later absented himself so no request could be made of him. Seven months elapsed from the date of the fire at plaintiff's residence and the date plaintiff filed suit.

"9. By letter of August 17, 1979, garnishee's attorney advised plaintiff's attorney that garnishee had made further investigation in the matter and had determined that Lowry was not negligent and therefore denied any claim made under the Errors and Omissions policy.

"10. Prior to the filing of this lawsuit and prior to August 17, 1979, when garnishee denied Lowry's negligence, garnishee's investigation had disclosed the following from Lowry:

"a) Lowry knew that Boone's property insurance was being cancelled on December 17, 1978.

"b) Boone came to Lowry's office seeking insurance on his property prior to the expiration of his earlier policy and filled out at least a FAIR Plan application in Lowry's office requesting coverage in a total amount of $21,000.00.

"c) Lowry had assured two officers of Citizens Savings Association that Boone's property insurance was 'in order.'

"d) Lowry, by his own admission, was not very familiar with the FAIR Plan and thought the application would be acted upon one way or the other in much less than forty-five days.

"e) Lowry received no acknowledgment of receipt of the application from the FAIR Plan at any time.

"f) The All-Industry Placement Facility had never received an application from Lowry for the Boone property.

"g) Between December 17, 1978, and February 14, 1979, Lowry had assured Citizens Savings Association that the insurance on the property was in order and had not suggested otherwise to Boone, and, in fact, had led Boone to believe the insurance was in order.

"h) On February 14, 1979, the day of the fire, Lowry himself was under the impression that the property had been insured and he had also assured both Citizens Savings Association and plaintiff that the property had been insured.

"i) Lowry acknowledged to garnishee's agent, referring to the FAIR Plan application, that 'Once I'd sent it in, I just kind of forgot about it, I just really didn't think about it anymore.' He further stated to the same individual that, 'I never even thought about it, I never followed up on it, I'll have to say that.'

"j) Lowry had advised the same individual that Boone would probably have been under the assumption up until late April, 1979, two and one-half months after the fire, that the property had been insured on the date of the fire.

"k) Lowry was not sure about the origin of the fire or what amount, if any, should be paid on the claim.

"11. Garnishee acknowledges that it has no firm evidence that Lowry's testimony at trial would have differed in any material respect from his recorded statement of May 10, 1979, to garnishee's investigator. The Court does not know how Lowry would have testified at trial because he did not testify.

"12. Information learned after Lowry's disappearance about Lowry caused MFA house attorneys to conclude that he may have lied to MFA. This information essentially consisted of evidence of Lowry's dishonesty leading to speculation that Lowry may have had knowledge regarding the origin of the fire. Whether money was exchanged between Boone and Lowry [for premium] was a matter about which Boone and Lowry disagreed with Boone claiming money was paid.

"13. Based upon the investigation performed by garnishee prior to the filing of the suit, there appeared to be some items of factual dispute. First, had Boone applied for both MFA and FAIR Plan Insurance or only for FAIR Plan coverage, or had any applications been properly made? Second, had Boone paid any premium to Lowry at the time of the application? Third, had Lowry, in fact, mailed the FAIR Plan application to the All-Industry Placement Facility? Fourth, the origin of the fire. Fifth, the value of the claim. There was no dispute that the All-Industry Placement Facility had not received the application and that Lowry had received no acknowledgment or inquiry from the All-Industry Placement Facility regarding the application, which would make Lowry sure that it had been received and was being acted upon.

"14. Lowry disappeared from Junction City on or about October 1, 1979, which was ten or eleven days after having been served with summons herein.

"15. No arson issue was tried in the principal case, but MFA thought it had been or should have been. MFA thought that the Boone property fire might have been arson, that Boone might have been involved and that Lowry might have knowledge with respect to the fire's origin.

"16. MFA did initially undertake to defend Lowry and filed pleadings on his behalf. MFA then withdrew from representing Lowry, after which answer time passed and default judgment against Lowry was granted by the Court. MFA also did make efforts to locate Lowry following his disappearance and was unable to locate him until January, 1981. He has again disappeared.

"17. The Errors and Omissions policy insuring Lowry provided in part that the insured shall cooperate with the insurer, disclosing all pertinent facts known or available to him, and upon the insurer's request, shall attend hearings and trials and shall assist in securing and giving evidence, obtaining the attendance of witnesses, in effecting settlements, and in the conduct of legal proceedings.

"18. From the time MFA first learned of Lowry's abandonment of his office and disappearance from Junction City on or about October 5, 1979, MFA did the following on the dates as indicated: [Stated here are twenty-seven activities by MFA, including interoffice thoughts and operations, designed to locate and communicate with Lowry. Included are activities of outside resources.]

"19. After his disappearance, Defendant Lowry intentionally withheld his whereabouts from MFA; made no attempt to answer or defend Boone's suit; appear at trial, give evidence at trial; help with witnesses; assist in effecting settlement or assist in the conduct of legal proceedings.

"20. Lowry's absence was not procured, caused or encouraged by MFA or Boone.

"21. MFA was prejudiced by reason of Lowry's failure to be available for the defense of the case as follows:

"a) Lowry allowed default judgment to be entered.

"b) Lowry, a social and business acquaintance of Boone, would have given MFA background information on Boone so they could have properly investigated and screened the arson issue which was implied by some available evidence but denied by Boone. Had the jury believed arson, insurance would not have paid for the loss and the failure to procure insurance would have caused Boone to sustain a loss.

"c) Lowry's own absence diminished his credibility and increased Boone's credibility before a jury. A jury which previously found in part in favor of MFA when Lowry was absent may have found entirely in MFA's favor had Lowry complied with his contract.

"d) Had Lowry been truthful concerning his taking premium money (if he did) and the binding of MFA to a policy, (if he did) MFA could have immediately admitted coverage and the entire cause of action against Lowry for damages would not have any basis.

"e) Lowry's unavailability prevented MFA from defending under a non-waiver thereby preventing MFA from limiting the judgment against Lowry to $6,536.50 rather than the default amount of $21,000.00.

"CONCLUSIONS OF LAW

"1. The Court treats the non-coverage defense as withdrawn since it was withdrawn or repudiated by the party. The Court finds the policy applicable and MFA liable except for the cooperation clause question.

"2. With respect to garnishee's claimed defense based upon Lowry's alleged breach of condition 4, the 'cooperation clause,' the Court concludes that said clause contains two distinct portions. With respect to the first portion, the Court holds that Lowry was required to cooperate with the company by disclosing and continuing to disclose all pertinent facts known or available to him. With respect to the second portion of the 'cooperation clause,' the Court holds that the insurer's request is a prerequisite to the insured's duty to attend hearings and trials and assist in securing and giving evidence, obtaining the attendance of witnesses, effecting settlements, and in the conduct of legal proceedings. However, such request is excused when it may not be conveyed because the insured has hidden himself from the insurer.

"3. The Court notes that one of the purposes of cooperation clauses is to protect the insurer's interest as well as third parties. *Watson v. Jones*, 227 Kan. 862, 866-67, 610 P.2d 619 (1980).

"4. Under these facts Lowry's hiding of himself after the filing of the suit was a breach of the cooperation clause. However, the insurer must also show prejudice from and materiality of that breach in order to avoid liability. See *Watson v. Jones.*

"5. If MFA would have defended Lowry without a valid non-waiver clause, it would have waived its policy defense of [non]cooperation.

"6. MFA was prejudiced by Lowry's failure to cooperate as required under the policy.

"7. In this case the degree of prejudice sustained by MFA exceeds that amount represented by the original verdict against MFA. The Court need not find absolute or ultimate prejudice in order to allow the defense of non-cooperation to excuse performance under the insurance contract. Only prejudice. See *Watson v. Jones*."

Appellant agrees with most of these findings, but asserts some are irrelevant and others lack evidentiary support and do not uphold the conclusions reached. The crux is whether the evidence supports the finding of breach of the cooperation clause and, if so, whether that breach prejudiced appellee in its defense of the action. Assuming, without deciding, that Lowry's nonappearance at trial breached the cooperation clause, we examine the latter issue.

Breach of a cooperation clause in a liability insurance policy does not by itself relieve an insurer of responsibility. The breach must cause substantial prejudice to the insurer's ability to defend itself. *Jameson v. Farmers Mutual Automobile Ins. Co.*, 181 Kan. 120, 127, 309 P.2d 394 (1957). See also 8 Appleman, Insurance Law and Practice § 4773 (1981). The burden of proof to establish this policy defense is on the insurer. *Watson v. Jones*, 227 Kan. 862, 610 P.2d 619 (1980).

Appellant challenges the propriety of finding 3 of the trial court: "By reason of Lowry's disappearance and failure to be present for the taking of a non-waiver of rights and for trial, MFA decided it should not attempt to defend Lowry based on his violation of the cooperation clause," which ties somewhat into finding 21: "MFA was prejudiced by reason of Lowry's failure to be available for the defense of the case as follows: . . . e) Lowry's unavailability prevented MFA from defending under a non-waiver thereby preventing MFA from limiting the judgment . . .," which in turn relate to the court's conclusion of law 5: "If MFA would have defended Lowry without a valid non-waiver clause, it would have waived its policy defense of [non]cooperation."

These findings, made at MFA's behest, seem largely irrelevant for several reasons. MFA first undertook Lowry's defense and then withdrew after it confirmed he had indeed embezzled premiums. We know of no reason why, in Lowry's absence, if it

could have been of any avail, MFA could not have made a unilateral reservation of rights, so far as Lowry was concerned, and defended in his absence. The situation is not like that presented in *Bogle v. Conway*, 199 Kan. 707, 433 P.2d 407 (1967), upon which MFA relies for its position, where there was great potential for conflict of interest between insurer and insured, that is, for a policy defense to be built up by the carrier at the expense of the insured, and there was a particular need for full awareness on the part of those insured in order to consent to dual representation by carrier's counsel.

Here there was no real conflict of interest between Lowry and MFA and no such need for explanation to establish awareness of what might happen. Any dilemma for MFA results from the two types of insurance it contracts — coverage for direct loss of property and coverage for a defaulting agent. On the one hand, because of misconduct of an agent it, along with the agent, may become directly liable for property loss, while on the other hand if offers liability insurance for that same misconduct. MFA saw no impediment to reimbursing appellant's mortgagee in the sum of $7,238.74 for its loss because of Lowry's wrongdoing, which it did by way of purchase of the mortgage. The only testimony in the record regarding the possibility of MFA defending Lowry under a reservation of rights was that the home office claims attorney knew that MFA could have done so. MFA's decision not to defend does not exonerate it under its errors and omissions policy. Moreover, as determined in the trial court's finding 7, MFA chose to defend this action solely on breach of the cooperation clause.

Appellant challenges the relevancy and supportive evidence as to finding 10 (k): "Lowry was not sure about the origin of the fire or what amount, if any, should be paid on the claim." As to the latter, Lowry's presence or absence at trial would have no significance upon the proof of damages. This is particularly the case here because of valued policy law. More anon about the origin of the fire.

Appellant challenges the sufficiency of evidence as to finding 13 respecting disputed factual items. The matter of the value of the claim has already been considered. A more specific finding respecting origin of the fire is yet to come. The court did find there was a dispute as to whether Boone had applied for both

MFA and Fair Plan coverage or whether any application had been made and also as to whether Boone had paid a premium to Lowry at the time of the application. These issues have no bearing on MFA's liability as garnishee under its errors and omissions policy where its agent negligently or corruptly failed to procure insurance after he had given assurance he had done so. Payment of a premium is not required in order to hold such an agent liable. *Rezac v. Zima,* 96 Kan. 752, 153 Pac. 500 (1915). Moreover, it was not required that a premium accompany the application for Fair Plan insurance.

Finding 15, that MFA thought arson had been or should have been an issue in the principal case, is a curious one in that arson was never mentioned in a somewhat elaborate pretrial order nor in the trial of that case, nor had it been mentioned in correspondence between counsel.

Finding 21 summarizes how Lowry's absence prejudiced MFA. Most items have already been mentioned. The significant thrust is on arson. If Boone had set fire to his house, this, of course, would have been a defense to the initial action.

MFA investigated the fire extensively for arson before Lowry's disappearance, interviewing appellant several times (two of which MFA tape recorded) and also fire department and police authorities, as well as Lowry, who never refused to answer any questions.

At the trial of this garnishment action, MFA proferred only two witnesses. One was Lowry's district manager, who testified only on matters not at issue. The other was an MFA home office claims attorney who testified at length about MFA's investigation and position.

This latter witness conceded that the subject matter of the claim was within the coverage of the errors and omissions policy and the only defense raised was breach of the cooperation clause. She believed arson was involved in the loss of the house. She suspected that Lowry might have had knowledge about the origin of the fire because one of MFA's investigators had learned "that Lowry and Boone were acquainted, that there might have been some sort of a plan to illegally plan to burn the house, something of that sort. But, at that time I dismissed that as being so insubstantial that I didn't, and so difficult to prove that I didn't feel like following up on that." Later, when she learned of

Lowry's dishonesty, she felt differently. However, she testified she did not know if Lowry had misrepresented anything to MFA's investigators or whether his testimony would have been any different if he had appeared at trial. "[I]t might have differed, but I don't have, it is only speculation." In answer to a question whether or not she was guessing or speculating that Lowry might have known more than he told MFA, this witness answered: "Yes. Anything I say as to what he would have said on the stand has to be speculation." This witness also testified that Lowry could have testified as to appellant's terrible reputation and his past claims history. Those matters, if true and admissible, would not have been within Lowry's exclusive testimonial domain.

From all this it appears that what MFA relies on is prejudice predicated upon Lowry's failure to appear and supply the missing ingredients necessary to show arson in the destruction of appellant's property. MFA was willing to pay appellant's mortgagee because it had nothing to do with the fire, but this was not the case with appellant. It is clear that this latter is purely speculative — and was so branded by the trial court in its finding 12. An insurer's burden of showing prejudice from a breach of a cooperation clause by the insured is not sustained by a showing of possible prejudice. The insurer must establish at the very least that if the cooperation clause had not been breached there was a substantial likelihood that the trier of fact, in an action against the insured, would have found in the insured's favor. *Northwestern Title Security Co. v. Flack,* 6 Cal. App. 3d 134, 85 Cal. Rptr. 693 (1970). See also *Jameson v. Farmers Mutual Automobile Ins. Co.,* 181 Kan. 120.

The evidence and findings do not support the requisite conclusion of substantial prejudice to MFA's ability to defend itself. The judgment is reversed and the cause is remanded with directions to enter judgment for appellant for $21,000, plus attorney fees pursuant to K.S.A. 40-256.

So ordered.