**Randy HARTMAN d/b/a Hartman's Family Foods, Plaintiff,**

v.

**GREAT CENTRAL INSURANCE COMPANY, and Nash–Finch Company, Defendants.**

No. 94–4210–SAC.

United States District Court, D. Kansas.

Jan. 10, 1996.

Daniel R. Lykins, Bryan, Lykins & Hejtmanek, P.A., Topeka, KS, David E. Copple, Jerry V. Fennell, Domina & Copple, P.C., Omaha, NE, for plaintiff.

Patrick J. Doran, Paul H. Niewald, Niewald, Waldeck & Brown, Kansas City, MO, Thomas L. Theis, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the defendant Nash–Finch Company's motion for summary judgment. (Dk. 75). The plaintiff Randy Hartman's grocery store burned to the ground and all of its contents destroyed on November 6, 1992. Hartman sues Nash–Finch alleging that it had agreed and/or had undertaken to assist him in procuring insurance for his grocery store and then failed to exercise reasonable care. Specifically, Hartman alleges that Nash–Finch failed to procure him the commercial insurance necessary to protect him, negligently determined the value of his business personal property, negligently advised the insurance broker, Seabury and Smith, that the value of his contents was $125,000 when it knew the replacement value of the plaintiff's inventory and contents would exceed $250,000, and failed to advise the plaintiff on the amount of coverage requested for the quote from Seabury & Smith and on the fact that full replacement coverage was subject to the policy limit of $125,000. Nash–Finch seeks summary judg-

ment arguing that it owed no such legal duties to Hartman, as it never agreed or undertook either to procure insurance or to perform any of the other alleged duties for Hartman.

## SUMMARY JUDGMENT STANDARDS

■ A court grants a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. The court is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

■ The initial burden is with the movant to "point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). If this burden is met, the nonmovant must "come forward with specific facts showing that there is a genuine issue for trial as to elements essential to" the nonmovant's claim or position. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993) (citations omitted). The nonmovant's burden is more than a simple showing of "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355; it requires " 'present[ing] sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor.' " *Thomas v. International Business Machines*, 48 F.3d 478, 484 (10th Cir.1995) (quoting *Bacchus Industries, Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir.1991)). The court views the evidence of record and draws all reasonable inferences in the light most favorable to the nonmovant. *Id.* A party relying on only conclusory allegations cannot defeat a properly supported motion for summary judgment. *White v. York Intern. Corp.*, 45 F.3d 357, 363 (10th Cir.1995).

■ More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion does not empower a court to act as the jury and determine witness credibility, weigh the evidence, or choose between competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 346 (10th Cir. 1986), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## STATEMENT OF UNCONTROVERTED FACTS

For purposes only of this motion for summary judgment, the court finds the following facts, as so stated, to be uncontroverted:

1. In January of 1991, the plaintiff, Randy Hartman ("Hartman"), purchased a going retail grocery store in Blue Rapids, Kansas. While he was new to the retail grocery business, Randy's brother had been a successful grocer for more than ten years. Randy often looked to his brother for advice on all aspects of the retail grocery business. The plaintiff named and operated his store as "Hartman's Family Foods."

2. Randy Hartman became an independent affiliate of the defendant, Nash–Finch Company ("Nash–Finch"). Nash–Finch is a nationwide wholesale grocer. Nash–Finch sponsors a Property and Casualty Insurance Program, but the affiliate's participation in the insurance program is not mandatory. Seabury & Smith, an independent insurance

brokerage firm in Minneapolis, Minnesota, markets the insurance available under the program, administers the program, and services the insureds covered under the program. The defendant Great Central Insurance Company ("GCIC") underwrites the majority of the insurance sold through the program.

3. When an affiliate takes over or buys a grocery business, a Nash–Finch representative prepares different documents to use in evaluating the grocery business's past performance and future profitability. One such document prepared for Hartman was a "pro-forma," which is an estimate of the business's performance based on information obtained from the previous owner or from the actual transaction. The pro-forma includes a cost for anticipated insurance. Nash–Finch representatives arrive at this figure based on the insurance costs of other stores of similar size and volume. In this case, Nash–Finch estimated Hartman's insurance cost would be .96% of the business's annual sales.

4. Nash–Finch is not licensed to and does not in fact engage in the practice of underwriting or selling insurance. It does not assist affiliates in choosing or selecting insurance coverages, other than to recommend that they consider the Nash–Finch insurance program. It distributes an advertising brochure on the Nash–Finch insurance program to affiliates on behalf of Seabury and Smith. The brochure states that: "we recommend you consider participating in the Nash Finch Company Comprehensive Property and Liability Insurance Program." If an affiliate is interested in this program, Nash–Finch refers the affiliate to Seabury & Smith. Nash–Finch receives no commission or fee for distributing the brochures or for referring affiliates to Seabury & Smith.

5. If an affiliate participates in the Nash–Finch insurance program, Nash–Finch allows the affiliate to include the insurance premium payments in Nash–Finch's ordinary weekly billings. Nash–Finch collects the premium payments and remits them monthly to Seabury & Smith. Seabury & Smith pays Nash–Finch an administrative fee for collecting and remitting the premiums.

6. When it came time to obtain commercial insurance for his newly purchased grocery business, Hartman spoke to his brother and Nash–Finch's representatives. It was the practice of Nash–Finch's retail counselors to ask if the affiliate had insurance. Nash–Finch's counselors recommended that Hartman first obtain a quote from a local agent before obtaining one from Seabury & Smith.

7. Hartman visited Darrell Fankhauser, a local licensed insurance agent. Fankhauser discussed the plaintiff's commercial insurance needs with Hartman and eventually gave him a quote for a package of commercial insurance. Fankhauser based the quote on what Hartman provided and requested. Hartman remembers telling Fankhauser about the inventory and square footage of the store. Hartman says he talked to someone at Nash–Finch to learn "the square footage of the [his own] store in general—what was going to use for the insurance purpose, because it wasn't only retail space it was the back area too because inventory was big stored back there." (Hartman Dep. at 84). Hartman also says he provided Fankhauser with information on the contents and inventory from a profit and loss statement. Fankhauser testified that Hartman wanted $150,000 coverage on business personal property and that he relied on Hartman to tell him the value of the contents and inventory. Fankhauser quoted Hartman rates for replacement cost insurance coverage with coverage limits of $115,000 on the plaintiff's inventory and stock-in-trade, and $35,000 on other business personal property and fixtures. The coverage also included a 100% co-insurance provision.

8. After Hartman received the quote from Fankhauser, he passed the quote onto either Nash–Finch or his brother who forwarded it to Nash–Finch. Hartman says that the Nash–Finch representatives said they would obtain the quotes from the company insurance program. A Nash–Finch representative then called Seabury & Smith for a quote and relayed some basic information about the types and limits of coverage that Hartman desired.[1]

---

1. The evidence of record is scant on this fact.

During their depositions, several witnesses were

9. Ms. Barbara Stage, a licensed insurance agent with Seabury & Smith, testified, as corroborated by her notes, that she called Hartman on or about February 2, 1991, to verify the basic information provided by Nash–Finch and to obtain additional information for the application. In that conversation, she asked Hartman whether he wanted to use $125,000 as the value for the insured contents, and Hartman told Stage that was the correct insured value.[2]

10. Ms. Stage relies upon the insured to provide her with the valuations for the business personal property to be insured. She is not trained nor instructed to assist the insured in making valuations.

11. Hartman decided to purchase the insurance under the Nash–Finch program as its annual premiums were less than those quoted by Fankhauser by approximately $1,000.

12. Seabury & Smith first sent Hartman an insurance binder and later sent him the original insurance policy. Hartman admits receiving the policy and not reading it prior to the fire except for the provisions on spoilage coverage.

13. Hartman's insurance with GCIC took effect on February 4, 1991, beginning a one-year term. In October of 1991, Hartman reported two spoilage losses to Seabury and Smith, which adjusted and paid the spoilage claims without any involvement by Nash–Finch. In January of 1992, Seabury & Smith contacted Hartman about renewing his insurance. Though the plaintiff or his wife at that time sought quotes from other insurers and asked Seabury & Smith for a quote with additional coverage for boiler and a higher policy limit, Hartman simply renewed his policy with Seabury & Smith in February of 1992 without changes in coverages. Nash–Finch did not participate in the discussions or price quotes concerning renewal of the insurance.

14. A fire on November 6, 1992, essentially destroyed the plaintiff's grocery business. He claimed his loss through Seabury & Smith. GCIC paid Hartman the policy limit of $125,000 for the loss of his business personal property. Hartman claims his actual loss of business personal property far exceeds what he was paid.

15. In his deposition, Hartman testified that Nash–Finch representatives expressly told him only that they would obtain another quote besides the local insurance agent's. Hartman testified, however, that no one from Nash–Finch told him that they would "take care" of his insurance needs. Hartman also said he had no conversations with Nash–Finch employees regarding the specific coverages of insurance that would be quoted or that he desired.[3] Hartman does not remember where he obtained or how he arrived at the figures used for insurable values on business personal property coverage.

16. Hartman and his wife admit that no one associated with Nash–Finch ever told them the meaning of the "replacement cost" coverage under their commercial insurance policy.

referred to a note in the insurance application that says a Nash–Finch zone manager called in the initial information. The plaintiff does not attach any evidence that explains or identifies what initial information had been actually conveyed by the zone manager. Larry Harder, a Nash–Finch representative, testified that zone managers could call Seabury & Smith with general information about a potential insured including, "what they paid for the fixtures and what they paid for the inventory and would give that general information to them. They would have general information as to the approximate size of the building and the structure of the building." (Harder Dep. at 9).

2. As he argues in his brief, the plaintiff testified that he did "not recall any conversation with officials of Seabury & Smith in 1991 concerning insurance." (Dk. 78, ¶ 10).

3. Hartman's citation of the Nash–Finch insurance program brochure and Harder's testimony about general practices does not controvert Hartman's testimony of what actually occurred. As for the testimony of the plaintiff's expert, Kim Holtorff, he is not a competent witness to what occurred, to what was said during the relevant time period, or to whether an agency relationship existed. Holtorff was not a party nor a witness to these relevant events. As for his opinion that an agency existed, this question is one of law for the court to decide, and any factual disputes surrounding it are left to the jury. *Barbara Oil Co. v. Kansas Gas Supply Corp.,* 250 Kan. 438, 446, 827 P.2d 24 (1992).

## CLAIMS

In the pretrial order, the plaintiff alleges his negligence claim as follows:

that the Defendant Nash–Finch as the agent, representative and/or broker for Defendant GCIC, was negligent in procuring insurance for the plaintiff, in the following particulars:

1. Nash–Finch failed to exercise reasonable skill and ordinary diligence in identifying the amount the business personal property insurance required to protect Plaintiff in the event of a 100% loss of business building contents.

2. Nash–Finch failed to advise Plaintiff of the exact amount of coverage which it had requested to be issued by GCIC for business and personal property insurance and that in the event complete loss of the contents of the store, Plaintiff would not be able to replace all inventory and store contents at replacement values.

3. Nash–Finch failed to accurately identify the correct approximately (sic) value of the contents of Plaintiff's store to be insured by GCIC and thereafter negligently communicated to GCIC that the contents of Plaintiff's store had an approximately (sic) value of $125,000.

(Dk. 66 at 4–5). The plaintiff also alleges a contract claim against Nash–Finch:

Plaintiff further alleges that Nash–Finch entered into an oral contract in January, 1991, with Plaintiff to secure business insurance to protect him in the event of catastrophic loss, accepted monies for premiums due and has breached the contract.

(Dk. 66 at 5). Nash–Finch seeks summary judgment on both the negligence and contract claims.

## PLAINTIFF'S POSITION

In his response, the plaintiff posits that "[t]he following disputed facts control this lawsuit." (Dk. 78 at 6). First, he "had very little knowledge of business insurance." *Id.* Though probably critical at trial, this fact is not material to the summary judgment issues. Second, "Nash–Finch acted in the role of an insurance broker when its representa-

tives assisted Mr. Hartman in the purchase of insurance for his new store." *Id.* This is more a finding or conclusion than a fact. Even more problematic is that it subsumes without any meaningful discussion the real issue whether the plaintiff has come forth with substantial evidence of a clear and convincing quality that reasonably tends to prove an agency relationship. Third, "Nash–Finch was negligent in identifying the approximate replacement value of Plaintiff's store fixtures and business inventory." *Id.* Fourth, "[t]he negligence of Nash–Finch directly contributed to Plaintiff being grossly underinsured." *Id.* Neither of these last two factual disputes are material in this summary judgment proceeding.

The plaintiff comments that the evidentiary record for this motion includes a number of depositions: Randy Hartman, Stephanie Hartman, Larry Harder, Walter G. Hreno, Darrell Fankhauser, Barbara Stage, Bob Hart, Bill Franz, Garret Littlejohn and all attached exhibits. (Dk. 78 at 6). The plaintiff's statement mischaracterizes the state of the record in several respects. The parties submitted only limited portions from the depositions. The parties did not submit any portions of the depositions of Hart, Franz, and Littlejohn. Finally, the summary judgment record does not include all exhibits attached to the named depositions. The entire summary judgment record consists of those matters appearing in Nash–Finch's appendix (Dk. 79) and Hartman's appendix (Dk. 87).

## NEGLIGENCE

 In Kansas, negligence is not a matter of presumption but of proof that one owed a legal duty to another and breached the duty thereby causing injuries to the other. *Wicina v. Strecker,* 242 Kan. 278, 280, 747 P.2d 167 (1987). "Actionable negligence must be based on a breach of duty." *Id.* The existence of a legal duty is a question of law. *Id.*

The plaintiff's legal theories on his negligence claim are poorly developed and ambiguous at best. The plaintiff straddles both sides of the fence when it comes to his agency theory. As quoted above, the plaintiff claims in the pretrial order that "Nash–Finch

as the agent, representative and/or broker for Defendant GCIC, was negligent in procuring insurance for the Plaintiff." (Dk. 66 at 4). Earlier in the same claims section of the pretrial order, the plaintiff alleges Nash–Finch offered and agreed to assist him in procuring insurance and then negligently advised Seabury & Smith on the insured values of the business property. (Dk. 66 at 3). In effect, the plaintiff argues Nash–Finch owed him a duty whether it was an agent for GCIC or him.[4]

In his response to the summary judgment motion, the plaintiff avoids discussing either agency theory and simply relies instead on the general rule that "[a] broker or agent *who undertakes to procure insurance for another* and through his fault or neglect fails to do so will be held liable for any damage resulting therefrom." *Keith v. Schiefen–Stockham Insurance Agency, Inc.,* 209 Kan. 537, Syl. ¶ 3, 498 P.2d 265 (1972) (emphasis added). Other than stating this general rule, the plaintiff does not attempt any application of it to the undisputed facts here.

In 1981 the Kansas Court of Appeals reviewed the relevant Kansas case law on actions against brokers and agents for failure to procure insurance:

> From the decisions discussed, we conclude an insurance agent or broker who undertakes to procure insurance for another owes to the client the duty to exercise the skill, care and diligence that would be exercised by a reasonably prudent and competent insurance agent or broker acting under the same circumstances. We will refer to this as the exercise care duty.
>
> It has been explicitly stated an action for the breach of this duty may be brought in contract or in tort. Although no Kansas

cases reveal particular exposition of legal analysis for the ability to bring the action on these alternative theories, it might be said the duty is both an implied contractual term of the undertaking (contract duty) and a part of the fiduciary duty owed the client by reason of the principal-agent relationship arising out of the undertaking. . . .

> . . . .

> . . . Reasonable implication may be utilized to prove the subject matter, terms and consideration for an agreement to procure insurance. In *Rezac* [*v. Zima,* 96 Kan. 752, 153 Pac. 500 (1915) ], it was deemed that within the contemplation of the parties at the time of their agreement were the "well-known standards" of term of insurance and premium amount. 96 Kan. at 755–56 [153 P. 500]. As *Mooney* [*v. Merriam,* 77 Kan. 305, 94 Pac. 263 (1908) ] observed less strict proof of the agreement may be tolerated agreements to renew insurance because they frequently are oral (77 Kan. at 310), we similarly believe less strict proof is required for an oral agreement to procure insurance than for a contract of insurance. After all, in cases such as this, the terms of the contract of insurance and its cost are within the field of expertise of the agent or broker and it is for this expertise that the agent or broker is sought out. . . .

> . . . .

> Contrary to argument made to us by Cohen on the question of dual agency, an insurance agent or broker who undertakes to procure insurance ordinarily is the agent of the client in matters connected with the procurement of the insurance; he may act as the agent of the insurer for

---

4. Confusion remains as to whether the plaintiff is claiming that a duty to procure insurance for him can arise simply from an agency relationship between Nash–Finch and GCIC or whether the plaintiff is claiming that Nash–Finch impliedly or expressly undertook to procure him insurance. The plaintiff's superficial legal analysis stops short of discussing any duty to procure adequate business property insurance simply because Nash–Finch may have been an agent of GCIC for some purposes in the transaction. For this reason, the court will not consider any such legal theory. Assuming the plaintiff had argued such a theory, Kansas law does not appear to recognize any such duty absent the agent undertaking to procure insurance. *See Rezac v. Zima,* 96 Kan. 752, 753–54, 153 P. 500 (1915) (insured authorized and directed the soliciting insurance agent to procure insurance); *Boone v. Lowry,* 8 Kan.App.2d 293, 301, 657 P.2d 64 (agent failed to procure insurance after giving assurance that he had done so), *rev. denied,* 232 Kan. 875 (1983); *Marshel Investments, Inc. v. Cohen,* 6 Kan.App.2d 672, 678–683, 634 P.2d 133 (1981) (and cases cited therein).

other purposes; he may represent either the client, or the insurer, or both.

*Marshel Investments, Inc. v. Cohen,* 6 Kan. App.2d 672, 683–85, 634 P.2d 133 (1981). Based on this framework, the critical questions here are two. First, did Nash–Finch undertake to procure insurance for Hartman independent of or as part of any existing agency relationship between them. Second, did Nash–Finch obligate itself to identify the correct replacement value of Hartman's business property, to obtain insurance that would protect Hartman adequately assuming a complete loss, and/or to advise Hartman that the amount of coverage it sought from GCIC was not sufficient to replace all of Hartman's inventory.

Kansas law defines agency as an express or implied contract whereby one party "confides to the other the management of some business to be transacted in the party's name, or on the party's account, and by which that other assumes to do the business and to render an account of it." *Barbara Oil Co. v. Kansas Gas Supply Corp.,* 250 Kan. 438, 446, 827 P.2d 24 (1992). An express contract of agency is where the principal delegates authority to the agent " 'by words which expressly authorize the agent to do a delegable act.' " *Professional Lens Plan, Inc. v. Polaris Leasing Corp.,* 238 Kan. 384, 390, 710 P.2d 1297 (1985) (quoting *Shawnee State Bank v. North Olathe Industrial Park, Inc.,* 228 Kan. 231, 236–37, 613 P.2d 1342 (1980)). An implied contract of agency is where " 'it appears from the statements and conduct of the parties and other relevant circumstances that the intention was to clothe the agent with such an appearance of authority that when the agency was exercised it would normally and naturally lead others to rely on the person's acts as being

authorized by the principal.' " *Id.,* 238 Kan. at 390–91, 710 P.2d 1297.

The party asserting an agency relationship carries the burden of establishing its existence with substantial evidence that is clear and convincing [5] in quality. *In re Branding Iron Motel, Inc.,* 798 F.2d 396, 401 (10th Cir.1986); *Barbara Oil Co.,* 250 Kan. at 447–48, 827 P.2d 24. "What constitutes agency and whether there is competent evidence reasonably tending to prove the" agency relationship are questions of law. *Memorial Hosp. v. Carrier Corp.,* 844 F.Supp. 712, 717 (D.Kan.1994); *Barbara Oil Co.,* 250 Kan. at 446, 827 P.2d 24. Still, it remains a question for the factfinder to resolve factual disputes which could establish an agency. *Barbara Oil Co.,* 250 Kan. at 446, 827 P.2d 24.

Hartman simply has not come forth with sufficient evidence from which a reasonable jury could find that he had expressly delegated to Nash–Finch the authority to procure commercial insurance on his behalf or to assume any of the other delegable duties for which he sues. He does not cite any deposition testimony or written exhibits tending to show that he had told a Nash–Finch representative to procure him commercial insurance in a requested amount, to determine his insurance needs and the amount of insurance necessary to protect him in the event of a total loss, or to estimate the replacement value of his inventory and business personal property. There are no contracts, documents or other evidence of record from which to infer that the contractual relationship represented by the affiliation between Nash–Finch and Hartman expressly entailed Nash–Finch also procuring Hartman's requested insurance, determining

---

**5.** "Clear and convincing" refers to the quality of proof, not the quantum. *Newell v. Krause,* 239 Kan. 550, 557, 722 P.2d 530 (1986). For the evidence to be clear and convincing,

> the witnesses to a fact must be found to be credible; the facts to which the witnesses testify must be distinctly remembered; the details in connection with the transaction must be narrated exactly and in order; the testimony must be clear, direct and weighty; and the witnesses must be lacking in confusion as to the facts at issue.

*Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979) (citations omitted). The evidence is clear "if it is certain, unambiguous, and plain to the understanding. It is convincing if it is reasonable and persuasive enough to cause the trier of facts to believe it." *Ortega v. IBP, Inc.,* 255 Kan. 513, 528, 874 P.2d 1188 (1994) (*citing Chandler v. Central Oil Corp.,* 253 Kan. 50, 58, 853 P.2d 649 (1993)).

his insurance needs, valuing his property for insurance purposes, or advising him on insurance coverages. At most, the record includes testimony that Hartman expressly authorized Nash–Finch to obtain a quote from Seabury & Smith. This limited authority is a far cry different from the more expansive authority associated with procuring requested insurance coverage, calculating replacement values, or determining insurance needs. Moreover, the plaintiff does not allege that Nash–Finch was negligent in asking Seabury & Smith for a quote.[6]

Nor would the evidence of record sustain a finding of an implied agency between Hartman and Nash–Finch. Nash–Finch did not hold itself out as an expert, underwriter, seller, broker or advisor of commercial insurance. *See Atlanta Women's Club, Inc. v. Washburne,* 207 Ga.App. 3, 427 S.E.2d 18, 20 (1992) (Where agent holds itself out as expert in insurance and performs expert insurance services on behalf of the insured, then the insured may rely on the agent to identify and procure the proper amount of type of insurance coverage.), *cert. denied,* 207 Ga.App. 915 (1993). The brochure about the Nash–Finch insurance program is dubious evidence, at best, of what Hartman and the Nash–Finch representatives were contemplating in January of 1991.[7] Nash–Finch's involvement in Hartman's acquisition of commercial insurance was limited in scope and duration. Nash–Finch representatives simply suggested that he first obtain a quote from a local insurer and then compare it to that quote to be obtained from Seabury & Smith. After calling Seabury & Smith for a quote, Nash–Finch representatives were not involved with any other details in Hartman's purchase of the insurance or in his later decision to renew the policy.[8] Though an implied agency relationship "may be inferred from a single transaction, it is more readily inferable from a series of transactions." *Barbara Oil Co.,* 250 Kan. at 449, 827 P.2d 24. Hartman offers no evidence that Nash–Finch representatives either said they would advise him or undertook to advise him on what type or amount of coverage he needed. *See Stokes v. Harrell,* 289 Ark. 179, 711 S.W.2d 755, 756 (1986) (An insurance agent ordinarily has no duty to advise insured on maintaining proper coverages absent some special circumstances indicative of a special and ongoing relationship); *Szelenyi v. Morse, Payson & Noyes Ins.,* 594 A.2d 1092, 1094 (Me.1991) (Even an insurance agent does not have duty to advise on the adequacy of coverage absent some special relationship with the insured evidenced by their course of dealings or the terms of their agency agreement). Nor did Hartman testify that Nash–Finch representatives told him to rely on or to use the estimates or figures off certain documents in calculating his insurance needs or in selecting his policy limits. Finally, there is no evidence that Nash–Finch representatives said they had prepared or had undertaken to prepare documents[9] with the intent that Hartman would

**6.** Specifically, he does not allege that he sought a quote for a specific requested amount of coverage and that Nash–Finch then failed to obtain a quote for the specified amount of coverage and further failed to divulge that the coverage of the quoted insurance was for less than what he had requested.

**7.** Hartman offers no evidence that in January of 1991 his understanding of Nash–Finch's role was based upon or influenced by the insurance brochure. Indeed, there is not even evidence that Hartman read the brochure in January of 1991. Even assuming he had, Hartman does not cite a single case recognizing agency liability based exclusively on corporate or association sponsorship of insurance programs for its members or affiliates. It seems contrary to the present state of law to treat sponsors as insurance agents or brokers when they do nothing more than recommend or refer its members or affiliates to a particular insurer.

**8.** The court does not consider Nash–Finch to have maintained any involvement in Hartman's insurance dealings simply by allowing him to pay his insurance premiums as part of Nash–Finch's ordinary weekly billings. This weekly premium collection program was strictly an administrative service by Nash–Finch that obviously benefitted Hartman, but it did not involve any advice or consultation on insurance matters. Nor does Nash–Finch become an agent to Hartman for all insurance matters simply because it was paid an administrative service fee by Seabury & Smith for the premium collection program.

**9.** Hartman's counsel argues the pro-forma document was where the figures were taken to determine insurance coverages. First, Hartman testified that he does not know where the insured values came from or how the coverage amounts were determined. Second, there is no evidence that Nash–Finch representatives prepared this

rely on the documents in determining appropriate replacement values for insurance coverage. An implied agency will not be inferred from circumstances that amount to nothing more than assumptions. *See Barbara Oil Co.*, 250 Kan. at 449, 827 P.2d 24. Finally, the mere fact that Nash–Finch undertook to transmit basic information for Hartman in obtaining a quote from Seabury & Smith does not mean that Nash–Finch undertook to become his agent with respect to all other aspects of his insurance dealings.[10] *See Epperson v. Connecticut Fire Insurance Company*, 314 F.2d 486, 490–91 (10th Cir.1963) (applying Kansas law).

In short, the plaintiff has not presented in this summary judgment proceeding sufficient evidence from which a reasonable jury could find that Nash–Finch was Hartman's agent with the authority or responsibility, expressly delegated or impliedly undertaken, to procure insurance in a requested amount, to determine and set correct replacement values for Hartman, or to advise him on the necessary policy limits and coverages.

**CONTRACT**

In its original memorandum, Nash–Finch briefs this claim and argues that Hartman lacks evidence to prove a contractual undertaking on Nash–Finch's part. Specifically, Nash–Finch points out that there are no documents memorializing any such agreement and that Hartman's testimony does not support the existence of a written or oral agreement. According to Nash–Finch, Hartman's testimony, at most, shows that its representatives told Hartman to obtain a quote from a local insurance agent and then pro-

vide that quote to Nash–Finch who would arrange for Seabury & Smith to contact him and provide him with its quote under the insurance program. Having arranged for a quote from Seabury & Smith, Nash–Finch maintains that it fully performed all that it was obligated to do under any supposed contract. Finally, Nash–Finch highlights that Hartman did not testify that Nash–Finch promised or undertook to procure him insurance, to value his property for insurance purposes, or to advise him about his commercial insurance needs.

The plaintiff's response does not oppose a single one of these arguments. In fact, he never mentions the arguments or even his breach of contract claim. Under these circumstances, the court treats the defendant's motion as uncontested. Having found insufficient proof that Nash–Finch promised or undertook to procure Hartman insurance, to value his property for insurance coverages or to advise him on his insurance needs, it follows that the plaintiff's evidence is likewise insufficient to prove an oral or implied agreement covering the same. The plaintiff comes forth with no facts or circumstances showing a mutual intent to contract on the terms as alleged. Nash–Finch, therefore, is also entitled to summary judgment on the plaintiff's contract claim.

IT IS THEREFORE ORDERED that Nash–Finch's motion for summary judgment (Dk. 75) is granted.

---

document with the intention to provide Hartman with insurable values for his business personal property. The document was only an aid in forecasting the economic viability of the grocery business for purposes of obtaining financing. Most of the property values appearing on that document either were based on information from the prior owner or on the actual negotiated price that Hartman was paying. Third, assuming Hartman did use those figures from the pro-forma document to determine insurance coverages, Hartman does not show that he did so on the advice of any Nash–Finch representative. Fourth, the cost estimate for insurance appearing on the pro-forma document does not constitute insurance advice. As explained by Harder, this estimate was simply part of the profit forecast

and was based on nothing more than the general operating costs of other grocery stores of similar size. Hartman does not present evidence that this estimate was used and intended to be used by Hartman in actually purchasing his commercial insurance.

10. Hartman fails to demonstrate that Nash–Finch representatives did anything but communicate the basic information that he had furnished them. In addition, Hartman does not offer any evidence, which could be called clear and convincing, to dispute that Ms. Stage of Seabury & Smith verified with Hartman the basic information and the requested amount of coverage prior to issuing the quote.